IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT S.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 20 C 6286 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Supplemental Security Income under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381a, 1382c, over three years ago in March of 2018. (Administrative Record (R. 168-73) ). He claimed that he had been disabled since 1993, due to a learning disability, ADHD, depression, anxiety, and social phobia. (R. 168, 189). Over the next two and a half years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on October 22, 2020. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on October 28, 2020. [Dkt. #8]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

I.

A.

Plaintiff was born on May 15, 1974, making him just 19 years old when he claims he became unable to work, and just 35 years old when the ALJ found him not disabled. (R. 12-39, 168). He dropped out of high school in his sophomore year and became a carpenter. (R. 376). But, he has seldom worked. (R. 190). Since high school, he has smoked marijuana every day but, after some time, it began to give him panic attacks. He discovered he could curb those with alcohol, so he began drinking a twelve-pack of beer most days in addition to smoking marijuana. He continued that course through about 2018 (R. 555), about the time he applied for Supplemental Security Income. (R. 168-73)

Mid-way through plaintiff's sixth grade year, he was tested at mid-fourth-grade reading level but at mid-sixth grade in wide range achievement. His reading problems were symptomatic of dyslexia. His poor attitude and attendance were rated to be the worst of his problems. (R. 313-15). After entering ninth grade, plaintiff had another such evaluation. Broad cognitive ability (similar to IQ level) and verbal ability were low average, reasoning was moderately deficient, perceptual speed was high average, and memory was moderately deficient. (R. 315-16). Academic achievement levels were severely deficient in reading, low average in math, and moderately deficient in written language and knowledge. (R. 317-18). The evaluator felt plaintiff was of low to high average abilities and was performing acceptably in math, but considerably lower in reading and written language. (R. 319).

As an adult, plaintiff underwent a neuropsychological evaluation in March of 2009. He reported a history of depression and that he had made several serious suicide attempts over the past

2

ten years. (R. 362). At the time, he was working as a carpenter, which helped his mental state. (R. 362). On the Wechsler Adult Intelligence Scale (WAIS-IV), he had a full-scale IQ score in the low average range at 82. (R. 366). Plaintiff's nonverbal reasoning was relatively strong, but he had difficulty processing verbal information, like spoken instructions. (R. 367). He had trouble comprehending complex auditory information, as well as with learning and memory (R. 367). Results were suggestive of ADHD. (R. 368). Processing speed was slowed. (R. 368). The neuropsychologist felt that plaintiff appeared susceptible to episodes of affective disturbance that likely involved features of depression sufficient to interfere with effective functioning. (R. 369). He thought plaintiff's difficulty with expressive language greatly interfered with his ability to express his emotions and that he was less able to manage ordinary levels of stress, struggling to function in situations to which most people could adjust easily. (R. 369). He was comfortable in structured and familiar situations. (R.369). He was interested in being round people and would demonstrate adaptive interpersonal behavior most of the time. (R. 369).

 Plaintiff had a more recent evaluation in November 2015. His general cognitive ability was in the average range of intellectual functioning. Again, his nonverbal reasoning was much better than his verbal reasoning. Processing complex visual information and spatial relationships was a strength; making sense of complex verbal information was a weakness. (R. 375). Reading skills were low average, but comprehension was intellectually deficient. (R. 378). Attention and concentration were in the low average range. (R. 379). Adaptive learning and thinking flexibility were average. (R. 379). Reading fluency was low intellectually deficient. (R. 380). Math problem solving was borderline, calculation was low average, and calculation speed was in the intellectually deficient range. (R. 380). His spelling was intellectually deficient, his sentence composition was

low average, and spontaneous written expression was intellectually deficient. (R. 381). Testing also revealed moderate depressive symptoms. (R.382). Diagnoses were Mild ADHD, bipolar disorder, and learning disorders in reading, writing, and mathematics. (R. 383).

In April 2017, plaintiff had an initial psychiatric evaluation with Dr. Huma Pandit. (R. 481-482). He reported he had been taking psychotropic medication since he was 18, including Seroquel, Trintellix, Vyvanse, Zyprexa, and Lamictal. Dr. Pandit noted a depressed affect and diagnosed bipolar disorder, substance abuse, and ADHD. Plaintiff reported multiple hospitalizations, most recently eight years earlier for suicidal ideation. He reported anxiety due to everyday stressors, but denied panic attacks. He said he had trouble sleeping, and continued to smoke pot and drink. He also said he experienced blackouts. Dr. Pandit indicated he would simplify plaintiff's medication regimen and directed plaintiff to continue meeting with a therapist.

From late August 2017 through early September 2017, plaintiff was admitted for six days for psychiatric treatment for bipolar disorder and psychosis, with symptoms of mood swings and increasing paranoia. (R. 424). In October 2017, plaintiff reported to his primary care physician that he had had a "psychiatric break" and had required two months of inpatient treatment, which he attributed to binge drinking. (R. 517).

In February 2018, plaintiff met with Dr. Pandit and reported that he was attending group sessions regularly for individuals with bipolar disorder, as well as SMART Recovery meetings for substance abuse. (R. 550). Plaintiff said he was feeling less paranoid and tried to keep busy, but still felt low motivation and at times "got stuck on things." (R. 550). Dr. Pandit observed that plaintiff's mood was low, his affect was anxious, and his judgment was poor. (R. 550). The doctor increased Lamictal and added Lithium and Wellbutrin. (R. 550). In March 2018, Dr. Pandit noted that plaintiff

4

had a low mood, anxious affect, and poor judgment. (R. 480). He increased plaintiff's Wellbutrin dosage to help with poor focus and motivation. (R. 480). A month later, mental status examination was the same: low mood, anxious affect, and poor judgment. (R. 478).

In March and April 2018, plaintiff underwent further psychological evaluation. (R. 531). Over the course of two days, he was administered all or part of 16 tests to measure depression, anxiety, mood, substance abuse, behavior, and personality. (R. 533). He was noted to be open and cooperative, though he rarely initiated conversation. (R. 533). Plaintiff's hygiene was poor, with strong cigarette and body odor. (R. 533). Mood was depressed and eye contact was sporadic. (R. 534). Plaintiff's affect was anxious, but less so as he became familiar. (R. 534). The examiner diagnosed chronic bipolar II disorder, current episode depressed, severe, generalized disorder, moderate, and alcohol use disorder, in early remission. (R. 538). The examiner also indicated that the testing suggested plaintiff had some intellectual delays and mild borderline features. The examiner noted that plaintiff might thrive better in a highly structured environment. (R. 533). Plaintiff's depression would likely be exacerbated by plaintiff's anxious distress and tendency to isolate. (R. 533).

Subsequent psychiatric notes indicated stable, with ongoing poor focus and motivation, crying spells, and sleep difficulties. In May 2018, Dr. Pandit noted that Plaintiff reported having experienced a two-day manic episode three weeks earlier. (R. 544). He reported spending most of his time at home watching television. (R. 544). Mental status examination again revealed low mood, anxious affect, and poor judgment. (R. 544).

The following week, plaintiff underwent a consultative psychiatric evaluation in connection with his application for benefits. (R. 554-557). The examiner thought that plaintiff's paranoia

appeared to coincide with substance abuse and though plaintiff described his symptoms as manic, they resembled depression or anxiety. Plaintiff was focused during the evaluation. Mental status examination revealed constricted affect. The examiner felt that plaintiff's processing was very slow and he had trouble with numbers. He diagnosed plaintiff with major depression, recurrent severe, polysubstance abuse in eight–month remission, generalized anxiety disorder, and rule out learning disability. (R. 554-557).

In July 2019, Dr. Pandit observed plaintiff to have an anxious affect, poor judgment, and limited insight. Mood was better. (R. 575). In April 2019, plaintiff reported to his primary care physician he had attempted to commit suicide by overdose the previous week. (R. 602). His medications were adjusted and were given to his parents to distribute. (R. 602). On September 3, 2019, Renee Voss, LMFT, CADC, plaintiff's treating psychotherapist from September 2016 through August 2019 (with a gap between January 2018 and May 2019), noted that plaintiff had returned to psychotherapy after a suicide attempt and hospitalization, on recommendation of Dr. Pandit. (R. 615-616). She noted Dr. Pandit had indicated a need to work on depression, self-care behaviors, and motivation, but that plaintiff had difficulty implementing his goals, and the terminated sessions, against her recommendation. (R. 615-616).

**B.**

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: "bipolar disorder, depression, anxiety, attention deficit disorder/attention deficit hyperactivity disorder, cannabis abuse, and alcohol abuse." (R. 17). The ALJ found that, while plaintiff had a number of other impairments, including sleep apnea, high blood pressure, high cholesterol, and

obesity, they were not severe. (R. 18-19). The ALJ then found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on the listings for mental impairments. (R. 19-28). The ALJ determined that the plaintiff had a mild limitation in understanding, remembering, or applying information; a moderate limitation interacting with others; a moderate limitation concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing oneself. (R. 26-27).

The ALJ then determined that plaintiff could perform work at all exertional levels with the following limitations:

> [he could] understand, remember, and carry out no more than simple routine tasks. The work should allow for performing the same tasks day in and day out. The work should not require any contact with the public, but can allow for no more than occasional contact with co-workers and supervisors. The work should not require teamwork situations (that is, the [plaintiff] should not have to work with others to complete the same job task(s)). The [plaintiff] can work independently. The work should not have strict quotas, but the [plaintiff] is capable of doing work where performance is measured by end-of-day production quotas. The [plaintiff] should not engage in fast-paced tasks or work where a machine sets the pace, but can do work with variable-paced tasks.

(R. 28). In addition, the ALJ determined that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 29). The ALJ then noted that plaintiff did not report some of the limitations he alleged – such as being bedridden for days or drowsiness due to medications – to his healthcare providers. (R. 29). He had the learning capacity to learn how to drive and perform finishing carpentry. (R. 29). He was able to live independently. (R. 29).

As for medical opinions, the ALJ found the opinions from the state agency reviewing physicians somewhat persuasive. The ALJ found some of the restrictions in the initial consideration opinion too restrictive and some in the reconsideration opinion not restrictive enough. (R. 30-31). The ALJ found the opinion from plaintiff's therapist not persuasive because of the manner in which it was presented and because it did not consider the plaintiff's non-compliance with medical treatment or alcohol/substance abuse. (R. 32).

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff could not perform his past work as a carpenter because it was skilled worked. (R. 32). The plaintiff could, however, perform other jobs that existed in significant numbers in the national economy, such as: packer (DOT #920.687-166, SVP 2, light exertion, 11,000 jobs), mail clerk (DOT #209.587-018, SVP 2, light exertion, 60,000 jobs), or cleaner (DOT#381.687-018, SVP 2, medium exertion, 1 million jobs). (R. 33). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 34).

**II.**

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses.

*Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

The substantial evidence standard is a low hurdle to negotiate. *Biestek*, 139 S. Ct. at 1154; *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021). If reasonable minds could differ, the court must defer to the ALJ's weighing of the evidence. *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). But, in the Seventh Circuit, at least thus far, the ALJ also has an obligation to build what the court has called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." As *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) put it: "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." [2] *But see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not

---

[2] The term "accurate and logical bridge" was first used by Judge Spottswood Robinson in a non-Social Security context in *Thompson v. Clifford*, 408 F.2d 154 (D.C.Cir. 1968), which said "'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." 408 F.2d at 167. Judge Posner, first used the phrase in a Social Security context in *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996) and would be the first to
(continued...)

address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record, ...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties, ... No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard: one reader's Mackinac Bridge is another's rickety rope and rotting wood nightmare. But no matter what one's view of the "logical bridge" requirement, no one suggests that the "accurate and logical bridge" must be the equivalent of the Pont Neuf. The subjectivity of the requirement makes it difficult for ALJs hoping to write acceptable decisions that stand up to judicial scrutiny when challenged, or when upheld at the district court level and challenged again before the Seventh Circuit.

But, at the same time, the Seventh Circuit has also called the logical bridge requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). Indeed, prior to *Sarchet*, the Seventh Circuit "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence . . . in cases in which considerable evidence

---

²(...continued)
acknowledge that it was not meant as a self-defining test or formula. *Cf., United States v. Edwards*, 581 F.3d 604, 608 (7th Cir. 2009)("We recall Holmes's admonition to think things not words...."); *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 990 (7th Cir. 2004).

More recently, the Seventh Circuit, in a Social Security case explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

is presented to counter the agency's position." *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984). Later, in *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court was more explicit when rejecting a plaintiff's argument that an ALJ failed to discuss his complaints of pain:

> We do not have the fetish about findings that Stephens attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).
>
> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do. . . . This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted). Or, as the court succinctly put it, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). Given the record, and plaintiff's inability to point to evidence that shows he cannot perform the simple work the ALJ found he could perform, the ALJ has done more than enough here.

### III.

The plaintiff argues that the ALJ committed the following reversible errors: (1) she failed to find listing level severity at Step 3; (2) she improperly rejected plaintiff's statements and asserted, without support, that her RFC assessment adequately accommodated any deficits; and (3) she failed

to support her assessment of opinion evidence. Any other arguments plaintiff might have presented are deemed waived. *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

As for the arguments presented, it has to be said that they are along the lines of nit-picking. That is something district courts are not permitted to do when reviewing an ALJ's opinion. *See Burnam v. Colvin*, 525 F. App'x 461, 464 (7th Cir. 2013); ], 617 F.3d 923, 929 (7th Cir. 2010); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Instead, the district court is charged with reading the ALJ's decision as a whole, and taking a common sense approach. *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019)("The court applies a common-sense reading to the entirety of an ALJ's decision."); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). While plaintiff points out small, perceived flaws in various facets of the ALJ's thorough decision, overall, he simply fails to show there is not substantial evidence to support the ALJ's findings. And, moreover, he fails to direct the court to any evidence that he cannot perform simple jobs like cleaner or packer.

Overall, this is a case – and a presentation – that call to mind the Sixth Circuit's observations: "When a party comes to us with nine grounds for reversing the [lower court's decision], that usually means there are none." *Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 692 F.3d 507, 509 (6th Cir. 2012). *See also United States v. Lathrop*, 634 F.3d 931, 936 (7th Cir. 2011) ("the equivalent of a laser light show of claims may be so distracting as to disturb our vision and confound our analysis."); *Cole v. Comm'r*, 637 F.3d 767, 772 (7th Cir. 2011) (a "scattergun approach generally does not serve [clients] well"); *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000)("kitchen sink approach to briefing [that] cause[s] distraction and confusion, [and] also consumes space that should

be devoted to developing the arguments with some promise.").

### A.

First, the plaintiff argues that the ALJ ought to have found his mental impairment was of listing level severity and that he was presumptively disabled at Step 3. While not specific, the plaintiff seems to think the ALJ ought have found he was markedly limited in two areas, or perhaps extremely limited in one. The ALJ, instead, found that plaintiff had a mild limitation in understanding, remembering, or applying information; a moderate limitation interacting with others; a moderate limitation concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing oneself. (R. 26-27).

Plaintiff's argument against the ALJ's Step 3 finding is not convincing. First of all, the ALJ's findings simply followed the finding of the state agency psychologist who reviewed the medical record at the reconsideration level. (R. 84). The ALJ accepted those findings, deeming them "persuasive overall." (R. 31). The opinion of a reviewing psychologist constitutes substantial evidence on the question of whether a plaintiff's impairments meet or equal a listing. *Massaglia v. Saul*, 805 F. App'x 406, 409–10 (7th Cir. 2020); *Davis v. Berryhill*, 723 F. App'x 351, 356 (7th Cir. 2018); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The other state agency reviewing psychologist – who found the plaintiff a bit more limited and whom the ALJ found somewhat persuasive – also concluded that plaintiff's impairments neither met nor equaled a listing. (R. 64).

Beyond that, the ALJ engaged in a thorough review of the medical record (R. 20-25) and, beyond accepting the opinions of the state agency reviewers on the listing issue, explained her findings each step of the way. For the mild limitation in understanding, remembering, or applying information, the ALJ noted that plaintiff could remember and apply information well enough to pass

a driving test, drive, and remember destinations when driving. He could follow instructions performing carpentry work. He made schedules to perform indoor and outdoor chores. (R. 25).

For the moderate limitation – interacting with others – the ALJ noted plaintiff had no problems getting along with family, friends, neighbors, and authority figures. He never lost a job because of problems getting along with others. He went to his parents' house for dinner or to help them, attended family gatherings, attended bipolar group therapy sessions, and kept doctor appointments and performed work that required some contact with co-workers and supervisors. There was nothing in the record that documented that the claimant had had difficulty with those interactions. He went shopping, ran errands, and ordered fast food; so nothing suggested he was more than moderately limited in interacting with others. (R. 25-26).

In concentrating, persisting, or maintaining pace, the ALJ explained her finding of a moderate limitation by noting that plaintiff could follow simple spoken instructions and follow story lines and concentration well enough to drive regularly. He could engage on social media and did not lose his train of thought at the hearing. (R. 26). For the mild limitation in adapting or managing oneself, the ALJ noted the plaintiff was never so unmotivated that he was unable to perform his personal care or grooming when needed. He could perform activities like doing laundry or showering without help. While he did not respond well to increased stress, there were no documented problems with anger. (R. 27).

The plaintiff clearly disagrees with the ALJ's findings – and those of the reviewing psychologists – but that is not how the substantial evidence standard works. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021)("Even if reasonable minds could differ on the weight the ALJ gave to the medical evidence, we will not substitute our judgment for that of the ALJ's by reweighing the

evidence."); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Moreover, while referring more than once to "dire findings", the plaintiff fails to point the court to any [Dkt. #16, at 8, 11], let alone any that demonstrate the ALJ's conclusions were not supported by "substantial evidence." It's up to the plaintiff to direct the court to the medical evidence in the record that establishes he is unable to work. *Kaplarevic v. Saul*, 3 F.4th 940, 943 (7th Cir. 2021); *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021); *Karr*, 989 F.3d at 513.

"Difficulty processing complex information" [Dkt. #16, at 8], for example, does not rule out a finding of a mild limitation in understanding, remembering, and applying information. The record shows plaintiff could process simple verbal instructions. Many jobs do not require the capacity to process complex information; jobs such as cleaner or packer, for instance. So, how is that a marked limitation? Plaintiff does not say. The plaintiff also argues that he has never held a job for more than a year. [Dkt.#16, at 9]. But that's not medical evidence of any disability. Many applicants for benefits, particularly for Supplemental Security Income, have rarely worked or even sought work. That doesn't automatically entitle someone to benefits. And finally, plaintiff complains that the ALJ confused his basic daily activities with a capacity to work on a sustained basis. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). But that's a misreading of the ALJ's opinion. The ALJ never said that doing chores or driving indicated plaintiff could work. She said they were evidence of some basic ability to follow instructions or concentrate on simple tasks. (R. 25-27). The plaintiff simply failed to show, with medical evidence, how his medically determinable impairments caused any limitations beyond those the ALJ found. *See Gedatus*, 994 F.3d at 905; *Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021); *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019).

**B.**

The plaintiff also disagrees with the ALJ's finding that he can perform simple tasks day in and day out while meeting end-of-day quotas. [Dkt. #16, at 12]. Again, however, plaintiff points to no medical evidence that he cannot perform such tasks. Notably, his neuropsychological evaluations as an adult have shown his cognitive ability to be in the low average range. (R. 375). His concentration skills are in the low average range as well. (R. 379). Adaptation and flexibility of thought were also low average. (R. 379). "Low average" cognitive ability and concentration does not necessarily translate to "disabled." *See, e.g, Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003)("Although [plaintiff] . . . has a low-average IQ, has done quite poorly in some of his classes, has a limited social life, and has definite problems with concentration, he functions poorly rather than being as it were off the chart."); *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021)(Even "a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace. . . . ").

The arguments plaintiff does make against this finding, again, are nit-picking. A few examples should suffice to demonstrate this. For example, plaintiff points to his claim that, at least once a week, he was too depressed to get out of bed. (R. 29). But, as the ALJ also noted, plaintiff never made such a complaint to any of his mental healthcare providers. That's a valid reason to disbelieve such a claim. ALJs are directed to "consider the consistency of the individuals own statements. To do so, [they] will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances." SSR 16-3p (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *8; *Michalec v. Colvin*, 2015 WL 8526359 (7th Cir. 2015)(ALJ properly considered discrepancies between plaintiff's allegations and his statements to his doctors). When people who are being treated for

16

depression are confined to bed every week due to their symptoms, the expectation is that such a significant thing would show up in at least one of their mental healthcare provider's notes.

Along similar lines, plaintiff also complains that the ALJ undermined his statement that his medications cause drowsiness, simply because it is not documented in treatment notes. (R. 29). [Dkt. #16, at 13]. Plaintiff says it's unclear why the ALJ thought this would have been mentioned in treatment notes. [Dkt. #16, at 14]. The answer is common-sense. If it is something that plaintiff claims is preventing him from working, one expects he would tell a mental healthcare provider about it at some point in the course of treatment. Again, when a plaintiff makes claims to an ALJ that are not reflected in treatment notes, that's a valid reason not to believe him.

Plaintiff also submits that the ALJ failed to consider that his "ongoing history of suicide attempts has repeatedly been documented." [Dkt. #16, at 13]. But it has not been repeatedly documented. In fact, it has never been documented at all. None of the records plaintiff points to are of any hospitalization for a suicide attempt, which would surely show up somewhere in plaintiff's medical records if it occurred. *See* (R. 362 (claim to Dr. Dobrowolsky), 424 (misuse of medication but no mention of suicide attempt), 481-482 (claim to Dr. Pandit that he was hospitalized for suicidal ideation in 2009), 518 (claim of binge alcohol use but stable and improved), 538 (alcohol abuse, denied suicidal ideation), 602 (medication misuse, not hospitalized)). There is a difference between an allegation and documentation. *Shaun R. v. Saul*, 2019 WL 6834664, at *5 (N.D. Ill. 2019). ALJs have to rely on medical opinions "based on objective observations," not claims, whether made to them or to doctors. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Elder v. Astrue*, 529 F.3d 408, 413, 416 (7th Cir. 2008).

17

**C.**

Finally, the plaintiff argues that the ALJ's assessment of opinions was unsupported by substantial evidence. The plaintiff cites no caselaw in support of this argument, and so it may be deemed forfeited. *See Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016). But, even if it were not inadequately developed, there is not much to it. It's simply another example of complaints that fail to move the needle of analysis to disability.

For example, the only medical provider opinion plaintiff points to is that of Ms. Voss, a psychotherapist; but, as plaintiff concedes, it is not an opinion at all, but a recitation of when plaintiff was treated and diagnoses of bipolar disorder, ADHD, and cannabis dependence. (R. 615-16). But, a diagnosis is not disability. *See Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998); *Gedatus*, 994 F.3d at 902-03; *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)("The issue in the case is not the existence of these various conditions of hers but their severity and, concretely, whether, as she testified ... they have caused her such severe pain that she cannot work full time."). And, as the ALJ said, the statement from Ms. Voss says nothing about limitations that might preclude work. (R. 32). As such, it lends nothing to the analysis, and it is difficult to see why the plaintiff focuses on it. The far more important factor in this case is that the plaintiff has offered no opinion from any of his doctors that his impairments disable him. *See Gedatus*, 994 F.3d 904 ("A fundamental problem is she offered no opinion from any doctor to set sitting limits, or any other limits, greater than those the ALJ set."); *Rice*, 384 F.3d at 370 (concluding ALJ could rely on state-agency doctors, and "[m]ore importantly, there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ").

Plaintiff also complains that the ALJ rejected the opinion of the initial level reviewing psychologist as too limiting without explanation. [Dkt. #16, at 15]. But this is another argument based on a misreading of the ALJ's Opinion. The ALJ specifically explained that "the severity to which [the reviewing doctor] opined was not supported by the evidence submitted at the reconsideration and hearing levels." (R. 30). "Supportability" remains a hallmark of an acceptable medical opinion. *See* 20 C.F.R. § 404.1520c(b)(2), 416.920c(b)(2); *Michael K. v. Saul*, 2021 WL 1546426, at *5 (N.D. Ill. 2021). Even a treating physician's opinion may be accorded less weight if it is inconsistent with the other medical evidence. *Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019); *Winsted v. Berryhill*, 915 F.3d 466, 472 (7th Cir. 2019). As for the statements from the plaintiff's mother and sister, it is enough to say that they are not entitled to the weight of an encyclical. In any event, the ALJ adequately considered them in limiting plaintiff to simple work. (R. 31-32).

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #21] is granted and the ALJ's decision is affirmed.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 1/5/22